**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Northern Improvement Company, et al., | CV-12-08011-PCT-DGC |
| Plaintiffs/Counterdefendants, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant/Counterclaimant. | |

Plaintiffs Northern Improvement Company ("NIC"), Alfred Jay Schritter, and Tomma Schritter filed this action against the United States to quiet title to the sand and gravel in two Arizona parcels of land pursuant to the Quiet Title Act, 28 U.S.C. § 2409a ("the QTA"). Doc. 12. The government has filed motions to dismiss for lack of subject matter jurisdiction and for summary judgment, and Plaintiffs have cross-moved for summary judgment. Docs. 127, 134. The motions are fully briefed, and no party has requested oral argument. Docs. 128, 135, 136, 138, 140-43. The parties submitted supplemental briefing at the Court's request. Docs. 142, 143. For the following reasons, the Court finds that subject matter jurisdiction exists and will grant summary judgment for NIC as to the NIC Parcel and against the Schritters as to the Schritter Parcel.

I.     **Background.**

The parties dispute the right of Plaintiffs NIC and the Schritters to mine for and remove sand, gravel, and decorative rock from two properties in Mohave County, Arizona.

Both properties were once owned in their entirety by Santa Fe Pacific Railroad Company ("Santa Fe"). Santa Fe obtained title to the properties through patents issued by the United States in 1923 for the Schritter parcel and 1924 for the NIC parcel. The patents issued to Santa Fe did not contain a mineral reservation in the United States, but the properties have since been severed into separately owned surface and mineral estates. The government has reacquired the surface estate in both properties, and NIC and the Schritters have acquired the mineral estate.

This dispute arose when Plaintiffs applied to the Bureau of Land Management ("BLM") for a permit to use the surface of the properties to remove sand, gravel, and decorative rock. The BLM refused to grant the permit based on its determination that NIC and the Schritters did not own the sand and gravel. Doc. 12 at 5-6. The Interior Board of Land Appeals ("IBLA") affirmed the BLM's decision, but declined to decide ownership of the sand and gravel. *Id.* Plaintiffs then filed this action to quiet title in the sand and gravel on the two parcels.

This case was assigned to another judge of this Court when it was filed in 2012. It remained there, with the parties conducting some discovery and seeking stays to complete an attempted settlement, until it was reassigned to the undersigned judge in 2018. Doc. 90. The parties have now completed additional discovery and summary judgement briefing.

### A. The Schritter Parcel.

In 1923, the government patented the surface and mineral estates of certain federal lands, including the Schritter Parcel, to Santa Fe.[1] *Id.* at 1. In a 1950 warranty deed, Santa Fe conveyed the surface estate in some of these lands, including the Schritter Parcel, to George F. Getz Jr. *Id.* at 2. This order will refer to this as the Getz Deed. The Getz Deed included two provisions by which Santa Fe reserved the mineral estate and other rights.

---

[1] The Schritter Parcel is an approximately 74.88-acre portion of land at the SW ¼ Sec. 35, T.21 N., R. 16 W., Gila & Salt River meridian, south of Hualapai Mountain Road, in Mohave County, Arizona. Doc. 126 at 1-2. The land was patented pursuant to the Act of July 27, 1866, 14 Stat. 292. *Id.* at 2. Citations to the docket are to page numbers attached to the top of each page by the Court's electronic filing system.

The parties refer to the first provision as the Schritter Mineral Reservation and to the second as the Schritter Railroad Reservation. *See id.* at 2-3.

In 1988, as part of a land exchange, the government reacquired various lands from a successor in interest to Getz, including the same interest in the Schritter Parcel that Getz had received from Santa Fe in the Getz Deed. *Id.* at 3. This order will refer to the deed in this 1988 transaction as the West Wing Deed. The West Wing Deed excepted "all oil, gas, coal and minerals, as reserved" in the Getz Deed. *Id.* Thus, the 1988 conveyance of the Schritter Parcel to the government was subject to Santa Fe's reservations in the Schritter Mineral Reservation and the Schritter Railroad Reservation.

In an October 2003 quitclaim deed, Santa Fe conveyed to the Schritters its "right, title and interest, if any, in and to decorative rock, sand, and gravel" in the Schritter Parcel. *Id.* In a March 2004 quitclaim deed, Santa Fe conveyed to the Schritters "all Santa Fe's right, title and interest, if any" in the Schritter Parcel. *Id.*

**B.** **The NIC Parcel.**

In 1924, the government patented its interest in certain federal lands, including the NIC Parcel, to Santa Fe. *Id.* In a 1938 Indenture, Santa Fe conveyed the surface estate in these lands, including the NIC Parcel, to Willie Wall. *Id.* at 4. This order will refer to this deed as the Wall Deed. The Wall Deed also included two provisions by which Santa Fe reserved the mineral estate and other rights. The parties refer to these provisions as the NIC Mineral Reservation and the NIC Railroad Reservation.[2]

The NIC parcel was also part of the 1988 West Wing Deed. In that deed, the government reacquired from a successor in interest to Wall the surface estate in the NIC Parcel that had been conveyed to Wall. *Id.* at 5. The West Wing Deed excepted "all oil, gas, coal and minerals, as reserved in" the Wall Deed with respect to the NIC Parcel. *Id.* Thus, the 1988 conveyance of the NIC Parcel to the government was subject to Santa Fe's reservations in the NIC Mineral Reservation and the NIC Railroad Reservation.

---

[2] The NIC Parcel is a portion of a 398.18-acre parcel of land located in Sec. 19, T. 21 N., R. 15 W., Gila and Salt River Meridian, in Mohave County, Arizona. Doc. 126 at 3. The lands were patented to Santa Fe pursuant to the Act of July 27, 1866, 14 Stat. 292. *Id.*

In 2002, Santa Fe quitclaimed to Tri-R Construction, Inc. ("Tri-R") "all of Santa Fe Pacific Railroad Company's right, title and interest, if any, in and to sand, gravel and decorative rock located within 100 feet of the surface" of land, including the NIC Parcel. *Id.* at 5. Tri-R quitclaimed that same interest in the NIC Parcel to NIC in 2004. *Id.*

### C. The Reservations.

The parties agree that no relevant differences exist between the NIC and Schritter Mineral Reservations, which this order will refer to collectively as the Mineral Reservations. *Id.* at 4. The parties also agree that no relevant differences exist between the NIC and Schritter Railroad Reservations, which this order will refer to collectively as the Railroad Reservations. *Id.* at 5. Because the reservations are substantially the same, the Court will refer only to the Getz Deed language for purposes of this order.

In the Getz Deed, Santa Fe was the grantor, Getz was the grantee. The deed included the following Mineral Reservation:

> Grantor expressly reserves and excepts *all oil, gas, coal and minerals whatsoever, already found or which may hereafter be found, upon or under said lands, with the right to prospect for, mine, and remove the same* and to use so much of the surface of said lands, as shall be necessary and convenient for shafts, wells, tanks, pipe lines, rights of way, railroad tracks, storage purposes and other and different structures and purposes necessary and convenient for the digging, drilling, and working of any mines or wells which may be operated on said lands. Grantor or its successors and assigns, will pay to Grantee, or [the] successors or assigns of grantee, a fixed price per acre for the surface of all lands appropriated under this exception and reservation, which price shall be equal to the average price per acre paid for all the lands above described, together with the fair market value of the buildings and permanent improvements, if any, on the land the surface of which is so appropriated. If the parties cannot agree on such fair value it shall be fixed by three appraisers, of whom each party shall appoint one and the two so appointed shall appoint the third.

Doc. 126 at 2 (emphasis added). The Getz Deed also included the following Railroad Reservation:

> This conveyance is made subject to and upon the condition that in the event that Grantor, or its successors or assigns, or The Atchison, Topeka and Santa

- 4 -

Fe Railway Company, or its successors or assigns, or any railway company at least a majority of whose stock it owns, may at any time hereafter desire to construct across the premises hereinabove described, any railroad tracks, telegraph and telephone lines, or other electric wire lines, oil or water pipe lines, roadways, ditches, flumes or aqueducts, *or to operate on said premises gravel and ballast pits and quarries and take material therefrom for railroad purposes*, the right of way for any such tracks, telegraph, telephone or other electric wire lines, pipelines, roadways, ditches, flumes and aqueducts, of sufficient width for the proper protection, maintenance and operation thereof, *and the land necessary and convenient for the operation of such gravel and ballast pits and quarries and the taking of material therefrom for railroad purposes*, may be appropriated by any such Company desiring to construct such tracks, wire lines, pipelines, roadways, ditches, flumes or aqueducts, *or to operate such gravel and ballast pits and quarries*, upon such Company paying or offering to pay Grantee, or the legal representatives, heirs, successors or assigns of Grantee, a fixed price per acre for all the land above described, together with the fair value of all buildings and permanent improvements constructed upon the land so appropriated; and Grantee, or their legal representatives, heirs, successors or assigns or Grantee, will convey to such Company such appropriated right of way upon demand and tender of payment as aforesaid.

*Id.* at 2-3 (emphasis added).

## II. Subject Matter Jurisdiction.

Plaintiffs sued to quiet title in the Schritter and NIC Parcels on January 18, 2012. Doc. 1. The government argues that this action is untimely under the QTA's 12-year statute of limitations because Plaintiffs' predecessors in interest knew or should have known before January 18, 2000, that the government claimed an interest in the sand and gravel on the two parcels. Doc. 127 at 2-8. The government does not substantially challenge the truth of facts alleged in Plaintiffs' complaint. The Court therefore will treat this as a facial attack under Rule 12(b)(1) and accept the alleged facts as true. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

### A. The Quiet Title Act.

#### 1. Waiver of Sovereign Immunity Under §2409a(a).

Section 2409a(a) of the QTA "waives the federal government's sovereign immunity to certain civil actions by plaintiffs seeking to quiet title to [real] property in which the

United States claims an interest." *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008) (citing 28 U.S.C. § 2409a). "[T]wo conditions must exist before a district court can exercise jurisdiction over an action under the Quiet Title Act: 1) the United States must claim an interest in the property at issue; and 2) there must be a disputed title to real property." *Leisnoi, Inc. v. United States*, 267 F.3d 1019, 1022 (9th Cir. 2001); *see also Robinson v. United States*, 586 F.3d 683, 686 (9th Cir. 2009) (same).

The government claims an interest in the surface estates of the Schritter and NIC Parcels, and the parties dispute whether the surface estates include title to the sand and gravel. The QTA's two jurisdictional requirements are satisfied, and the government does not argue otherwise. *See* Doc. 127 at 1-3.

### 2. Statute of Limitations under § 2409a(g).

Even with these two conditions satisfied, the Court lacks subject matter jurisdiction if Plaintiffs' claims are untimely under § 2409a(g). *Kingman Reef*, 541 F.3d at 1196. That section bars a civil action under § 2409a(a) unless "it is commenced within twelve years of the date upon which it accrued." 28 U.S.C. § 2409a(g).

The government argues that because the statute of limitations is jurisdictional, Plaintiffs bear the burden of proving that their claims are timely. Doc. 138 at 2. The Ninth Circuit law on this issue is not clear. The Court of Appeals did hold in *Kingman Reef* that the QTA statute of limitations is jurisdictional, and a plaintiff typically has the burden of establishing subject matter jurisdiction. 541 F.3d at 1195-96. But *Kingman Reef* expressly declined to decide "who bears the burden of proving timeliness for purposes of the QTA." *Id.* at 1197.[3] Another the Ninth Circuit case has suggested that the QTA statute of limitations is not jurisdictional and that plaintiffs need not show timely filing. *See Leisnoi*, 267 F.3d at 1025 n.3. The Court need not attempt to resolve this confusion because this case is not time barred regardless of who bears the burden of proof.

---

[3] At least one Ninth Circuit case, in a non-QTA setting, has cited *Kingman Reef* for the proposition that a plaintiff bears the burden of showing timeliness when a statute of limitations is jurisdictional. *See Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1162 (9th Cir. 2012).

The 12-year limitations period begins running "on the date the plaintiff or his predecessor in interest *knew or should have known of the claim of the United States*." 28 U.S.C. § 2409a(g) (emphasis added). "The statutory term 'should have known' imparts a test of reasonableness. The question is whether *the United States' actions* would have alerted a reasonable landowner that the government claimed an interest in the land." *Shultz v. Dep't of Army, U.S.*, 886 F.2d 1157, 1160 (9th Cir. 1989) (emphasis added).

Ninth Circuit cases have announced inconsistent standards for determining when a claim has accrued.[4] Rather than attempt to sort through and reconcile these inconsistencies, the Court will rely on the language of the statute and the basic test articulated in *Schultz*: "whether the United States' actions would have alerted a reasonable landowner that the government claimed an interest in the land." *Shultz*, 886 F.2d at 1160. This statement comports with the issue posed by the government in this case: "whether Plaintiffs, or their predecessor in interest, Santa Fe, knew or should have known that the United States claimed an interest in the sand and gravel on or in the NIC and Schritter Parcels prior to January 18, 2000." Doc. 127 at 4. Applying this standard, the Court concludes that Plaintiffs' cause of action did not accrue more than 12 years before this case was filed.

### B. Accrual of Plaintiffs' Claims.

#### 1. West Wing Deed.

The government first argues that Plaintiffs' successor in interest, Santa Fe, had notice of the government's claim from the recording of the West Wing Deed in 1988. The government asserts that the deed specifically referred to the Getz and Wall Deeds, which in turn contain the Mineral and Railroad Reservations that determine title to the sand and gravel. Doc. 127 at 4-5. Although it is true that recording of the West Wing Deed would

---

[4] For example, the Ninth Circuit has stated that the government's claim "need not be clear and unambiguous," *Kingman Reef*, 541 F.3d at 1198, but also that accrual does not occur "when the United States' claim is ambiguous or vague," *Alaska v. United States*, 201 F.3d 1154, 1164 (9th Cir. 2000). The Ninth Circuit has stated that a cause of action accrues "when a claim of title in favor of the United States becomes adverse to the plaintiff," *Leisnoi*, 267 F.3d at 1025, but also that accrual does not require "a showing of adversity," *State of Cal. ex rel. State Land Comm'n v. Yuba Goldfields, Inc.*, 752 F.2d 393, 397 (9th Cir. 1985). The Court has found other inconsistencies in Ninth Circuit law on this subject.

give constructive notice of the deed to Santa Fe, the Court cannot conclude that knowledge of the deed would provide actual or constructive notice that the government claimed an interest in the sand and gravel on the Schritter and NIC parcels. Santa Fe expressly reserved a mineral estate in both parcels, which eventually was transferred to Plaintiffs. Whether the Railroad Reservation in the Getz and Wall Deeds reserved the right to sand and gravel is the very issue disputed in this case. The parties read the Railroad Reservation quite differently. The Court sees no basis for finding that Santa Fe – from mere recording of the West Wing Deed – knew or should have known that the government read the Railroad Reservation in the Getz and Wall deeds as giving it the right to sand and gravel.

Although recording of the West Wing Deed clearly provided notice that the government had acquired the surface interest in the Schritter and NIC parcels, that is not the issue in this case. The issue is whether Santa Fe reasonably knew that the government claimed an interest in the subsurface sand and gravel. Recording of the deed did not reveal such a claim because a reserved mineral interest like Santa Fe's can coexist with a surface interest like the government's. The government's general acquisition of the surface interest, as reflected in the recorded deed, was not inconsistent with Santa Fe's (and later, Plaintiffs') right to sand and gravel.

The government relies on *Yuba Goldfields*, which stated that "[c]onstructive notice of recorded deeds may commence the running of the [QTA] limitations period." 752 F.2d at 396. But the deeds in that case clearly gave notice that the government was the sole owner of the disputed property, and California knew the property had been deeded solely to the government. *Id.* Unlike this case, there was no dispute about the meaning of the deeds. *Yuba Goldfields* does not support a conclusion that mere recording of the West Wing Deed put Plaintiffs on notice of the government's sand and gravel claim.

The government also relies on *Adams v. United States*, 687 F. Supp. 1479, 1491 (D. Nev. 1988), to assert that "under Arizona's notice statute for recorded documents, recordation of the West Wing Deed provided the requisite notice . . . of the United States' claim to sand and gravel in the NIC and Schritter Parcels." Doc. 127 at 4-5. The Court

does not agree. The test is not simply whether a deed was recorded, but whether recording of the deed would place a reasonable person on notice that the government claimed an interest in the sand and gravel. The government cites no case holding that mere recording of a deed, the meaning of which is disputed by the parties, constitutes sufficient notice of a federal claim to trigger the limitations period of the QTA.

### 2. Decisions by Arizona Court of Appeals.

The government argues that Santa Fe had constructive notice of the government's interest in the Schritter and NIC Parcels in January 1985 when the Arizona Supreme Court denied review of the Arizona Court of Appeals' decision in *Spurlock v. Santa Fe Railroad Co.*, 694 P.2d 299 (Ariz. Ct. App 1984), or, at the latest, in July 1999 when Santa Fe's counsel obtained the Court of Appeals' decision in *U.S. Power Systems, Inc. v. Red Mountain Mining, Inc.*, CA-CV 98-0415 (Ariz. Ct. App. Apr. 22, 1999). Doc. 127 at 4-5, 8. For reasons stated in detail below, the Court does not agree that *Spurlock* supports the government's reading of the Railroad Reservation, and *U.S. Power* cannot, under Arizona law, be cited as precedent or even for persuasive value.[5] The Court cannot conclude that these cases gave Santa Fe constructive notice of the government's claim to sand and gravel.

### 3. The Parties' Conduct.

Each side cites conduct by the opposing party that arguably is inconsistent with the party's present position. Although it is clear that both sides have behaved inconsistently at times, the Court cannot conclude that this inconsistent behavior reasonably alerted Plaintiffs or their predecessor, Santa Fe, of the fact needed to trigger the running of the limitations period – that the government claimed an interest in the sand and gravel.

The government's predecessor on the Getz deed, Globe Corporation, signed a 10-year sand and gravel lease with Mohave County in 1981 ("the Globe Lease") which

_____

[5] Even if *U.S. Power* could be considered for persuasive value, the decision did not trigger the QTA's limitations period. A memorandum decision by the Arizona Court of Appeals, ruling on a case in which neither Plaintiffs or the government were parties, does not constitute action by the federal government that would have alerted a reasonable landowner to the government's claim to sand and gravel in the NIC and Schritter Parcels. *See Shultz*, 886 F.2d at 1160.

allowed the county to remove sand and gravel from the land. *Id.* at 5. The government asserts that there is "no evidence that Santa Fe, which held the mineral reservation in the parcel, ever disputed Globe Corporation's execution of the Globe Lease." *Id.* But the government presents no evidence that Santa Fe knew of the Globe lease. And a mere lack of evidence that Santa Fe opposed the lease does not show that Santa Fe knew the government – which had no interest in the parcel at the time – claimed or someday would claim an interest in the sand and gravel. Moreover, while the Globe lease applied to land conveyed through the Getz Deed, it did not involve the Schritter or NIC Parcels. *Id.* at 5; Doc. 134 at 6. Santa Fe's alleged lack of action regarding parcels not at issue does not constitute a claim by the government sufficient to trigger the limitations period.

In 1991, the City of Kingman asked Santa Fe if it could remove sand and gravel from part of the same parcel covered by the Globe lease. Doc. 127 at 6. Santa Fe's Land Commissioner, G.R. Wagner, responded in a letter to the city:

> [I]t is true that it is our position that sand and gravel belong to the surface owner. That being the case, [Santa Fe] cannot give the City authorization to remove sand and gravel from the property. We have no objection, however, to your removing these materials if the surface owner agrees. Any minerals other than sand and gravel cannot be removed without an agreement with our company.

*Id.*

The government contends that this response "demonstrates that following the decision in *Spurlock*, Santa Fe knew or should have known that the surface owner had a potential claim to the sand and gravel in any parcels containing the same railroad reservation language found in the Getz Deed." *Id.* But the inquiry by the City of Kingman was not a claim to the sand and gravel by the federal government, and the city's inquiry concerned parcels other than the Schritter and NIC parcels. *See* Docs. 127 at 6; 138 at 10-11. The government asserts that the letter shows the United States had "a potential claim" in "any parcels" with the same language as the Getz Deed (Doc. 127 at 6), but the Court cannot conclude that a "potential claim," by a federal government that did not yet

own any relevant parcels, and would someday own different parcels, would put a reasonable person on notice that the federal government claimed an interest in sand and gravel on the Schritter and NIC parcels. Nor can the Court conclude that this letter reflected Santa Fe's knowledge of *Spurlock*. As explained below, *Spurlock* did not decide the issue in this case.

The government also argues that at some point Santa Fe "began issuing only quitclaim deeds to sand and gravel in parcels whose deeds contained a general mineral reservation and a specific railroad reservation, including the NIC and Schritter Parcels at issue." Doc. 127 at 7. But the Court cannot conclude that the issuance of such deeds constituted notice that the government asserted a claim to sand and gravel in the Schritter and NIC parcels.

Plaintiffs note that they asked the government whether it claimed an interest in the sand and gravel on the Schritter and NIC parcels, and the government said no. In letters dated December 31, 2003 and April 26, 2004, the acting field manager of the BLM Kingman's office stated that Plaintiffs had the right to mine sand and gravel from the parcels and that mining could proceed. Doc. 139 at 9. These letters are consistent with the Court's conclusion that the government did not assert a claim to the sand and gravel in the parcels more than 12 years before this action was filed.[6]

### C.    Statute of Limitations Conclusion.

The Court cannot conclude that Plaintiffs or their predecessor, Santa Fe, "knew or should have known of the claim of the United States" more than 12 years before this case was filed. 28 U.S.C. § 2409a(g). The government did not take "actions [that] would have alerted a reasonable landowner that the government claimed an interest in the [sand and gravel]." *Shultz*, 886 F.2d at 1160.

---

[6] The government argues that the inquiries from Plaintiffs that prompted these letters show that "there was a question in Plaintiffs' minds as to whether they were entitled to remove sand and gravel from the NIC and Schritter Parcels." Doc. 138 at 7. But even if this is true, the Court cannot conclude that doubts in Plaintiffs' minds constitute actions of the government that would have alerted a reasonable landowner that the government claimed an interest in the land. *Shultz*, 886 F.2d at 1160.

**III.    Summary Judgment.**

The parties have cross-moved for summary judgment.  The government argues that it holds title to the sand and gravel on the parcels for two reasons: (1) under Arizona law, the deed language is clear that the surface estate owner holds title to sand and gravel; and (2) if not, the extrinsic evidence establishes the parties' intent in the government's favor. Docs. 127 at 13, 15.  Plaintiffs assert that their mineral estates include sand and gravel, relying exclusively on extrinsic evidence in the record that purportedly proves this intent. *See* Doc. 134 at 11-18.  Plaintiffs counter the government's interpretation of the applicable law, but their motion does not argue that under Arizona law the plain language of the deeds conclusively establishes that their mineral estates include title to the sand and gravel.

On April 19, 2019, the Court ordered supplemental briefing pursuant to Rule 56(f), directing the parties to respond to the Court's proposed reasoning for entering judgment in favor of Plaintiffs based on the plain language of the deeds.  Doc. 141.  The Court has considered that briefing and now concludes that the plain language of the deeds shows that Plaintiffs' mineral estates include title to the sand and gravel.

**A.    Arizona Deed Interpretation Standard.**

State law governs the "transfer of property[] and defines the rights of its owners." *See Oregon State Land Bd. v. Corvallis Sand & Gravel Bo.*, 429 U.S. 363, 378 (1977). Following the parties' lead, the Court will apply Arizona law.  Arizona courts "apply rules of contract interpretation to the interpretation of deeds, and [the] primary goal is to give effect to the intent of the parties."  *Campos v. Campos*, No. 2 CA-CV 2013-0139, 2014 WL 2159348, at *2 (Ariz. Ct. App. May 22, 2014) (citing *Scalia v. Green*, 271 P.3d 479, 483 (Ariz. Ct. App. 2011); *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1139 (Ariz. 1993) (primary purpose is to determine and enforce intent of parties at time contract made)); *see also Spurlock*, 694 P.2d at 304.

"To determine intent, [courts] look first to the plain meaning of the words in the context of the deed as a whole."  *Campos*, 2014 WL 2159348, at *2.  "When a deed is unambiguous, the intent of the parties must be discerned from the four corners of the

document." *Scalia*, 271 P.3d at 483 (citing *Spurlock*, 694 P.2d at 304). But ambiguity need not exist before courts may consider extrinsic evidence of the parties' intent. *See Taylor*, 854 P.2d at 1140. Courts "also may consider extrinsic evidence of intent if the deed is reasonably susceptible to the interpretation suggested by the proponent of that evidence." *Campos*, 2014 WL 2159348, at *2 (citing *Long v. City of Glendale*, 93 P .3d 519, 528 (Ariz. Ct. App. 2004) (if "writing is 'reasonably susceptible' to the interpretation suggested by the proponent of the extrinsic evidence then the court should admit the extrinsic evidence" of the parties' intent); *Taylor*, 854 P.2d at 1140).

### B. Discussion of Applicable Law.

When, as here, the Arizona Supreme Court has not addressed an issue of state law, "the Court must predict how that court would decide the issue. When making this prediction, the Court should look to 'intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" *Steinberger v. IndyMac Mortg. Servs.*, No. CV-15-00450-PHX-ROS, 2017 WL 6040003, at *10 (D. Ariz. Jan. 12, 2017) (quoting *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990)). The Court is obligated to follow intermediate state appellate court decisions on point, but this obligation "does not have the same force when the relevant intermediate appellate court decision is unpublished. In that situation, a federal court must 'consider' the unpublished decision as an indication of the proper interpretation of Arizona law." *Id.* (citing *Emp'rs Ins. of Wausau v. Granite State Ins.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003)).

The government concedes that if the Getz and Wall Deeds had "no specific railroad reservation mentioning sand and gravel . . . then sand and gravel would come within the general mineral reservations." Doc. 138 at 12. The government argues that inclusion of the Railroad Reservations, which "specifically identify[] sand and gravel," conclusively "demonstrates an intent that such materials are not included in the General Mineral Reservations." Docs. 127 at 15; 142. The government cites four cases as support: *Spurlock*, *U.S. Power Systems*, *Mendez v. Carley*, No. 1 CA-CV 03-0792 (Ariz. Ct. App. Oct. 19, 2004), and *State Land Department v. Tucson Rock & Sand, Co.*, 481 P.2d 867,

869 (Ariz. 1971). The government concludes from these cases that "all commercially valuable substances separate from the soil fall under the general mineral reservation as a matter of law, except substances that are specifically mentioned in another reservation or if another provision of the deed shows a specific intent to limit the general reservation." Doc. 127 at 13-15.

### 1. *Spurlock.*

In *Spurlock*, the surface estate owners sued Santa Fe to quiet title to minerals on the property at issue, including helium, nitrogen, potash, petrified wood, industrial clay, and sand and gravel. 694 P.2d at 303. The principal issue before the Arizona Court of Appeals was whether "a deed reservation of 'all oil, gas, coal and minerals whatsoever, already found or which may hereafter be found, upon or under said lands,'" included helium, nitrogen, potash, petrified wood, and industrial clay. *Id.* at 304. The Court of Appeals discussed other jurisdictions' approaches to similar mineral reservations and concluded that the best approach was "to treat the term minerals as unambiguous." *Id.* at 304-08. The court stated that a reservation of "all minerals whatsoever" reflected the parties' general intent to "sever the surface estate from the underlying mineral estate" and "create two distinct, co-existing, and individually valuable estates." *Id.* at 308-09 (citations omitted). The grantor "retain[ed] ownership of all commercially valuable substances separate from the soil," including unknown minerals, and the grantee owned the surface for its use and enjoyment. *Id.* (citations omitted). The Court of Appeals accordingly held that the term "minerals" was unambiguous and included helium, nitrogen, potash, wood, and clay. *Id.* at 311.

Title to the sand and gravel was not before the Arizona Court of Appeals. As *Spurlock* itself explained, in the trial court Santa Fe asserted a nonexclusive right to sand and gravel not through the general mineral reservation, but through the "right to take gravel and ballast for railroad purposes pursuant to a different provision contained in the deeds to Spurlock's predecessors in title." *Id.* at 303. In other words, Santa Fe, for reasons that are not disclosed in *Spurlock*, chose to rely on the Railroad Reservation for a non-exclusive

right to access gravel and ballast, rather than arguing that the Mineral Reservation gave it an exclusive right to sand and gravel. The trial court never decided if this interpretation of the Railroad Reservation was correct because it found that Santa Fe had "abandoned any right it may have had to take sand and gravel for railroad purposes." *Id.* at 311. Santa Fe did not appeal this decision. *Id.* As a result, the rightful owner of the sand and gravel in light of the Mineral Reservation and the Railroad Reservation was a question never presented to either the trial court or the Court of Appeals in *Spurlock.*

The Court of Appeals recounted all of these facts, but nonetheless stated that "[b]ecause specific mention is made of 'gravel and ballast' [in the Railroad Reservation], the foregoing discussion concerning the general mineral reservation is not applicable to these substances." *Id.* This was pure dictum. The issue – whether the mention of gravel and ballast in the Railroad Reservation excluded sand and gravel from the Mineral Reservation – was never litigated by the parties or presented to the Court of Appeals. As a result, *Spurlock* provides no decisional law on this issue. And the Court accordingly cannot accept the import of the government's assertion that *Spurlock* "quiet[ed] title to sand and gravel against Santa Fe (the mineral reservation holder in that case), in favor of the surface owner under a deed with virtually the same reservation language contained in the Getz and Wall Deeds." Doc. 127 at 5. While this statement is a technically accurate description of the case's final outcome, title to the sand and gravel was quieted because the trial court found that Santa Fe had abandoned any interest in it, not because of the meaning of the Mineral or Railroad Reservations. Nor can the Court accept the government's assertion that, in light of *Spurlock*, "when the United States recorded the West Wing Deed in June 1988, Santa Fe was on notice that the United States claimed an interest in the sand and gravel on the NIC and Schritter Parcels." *Id.*

Indeed, if the actual *holding* in *Spurlock* has any meaning for this case, it was that "a reservation of 'all minerals whatsoever'" – the language in the Mineral Reservation in this case – "reflects a *general* intent of the parties to sever the surface estate from the underlying mineral estate." *Id.* at 308 (emphasis in original). "Thus, the grantor retains

ownership of all commercially valuable substances separate from the soil, while the grantee assumes ownership of a surface that has value in use and enjoyment." *Id.* *Spurlock* recognized that this general intent can be modified by a specific intent reflected in other parts of the deed – an issue that will be addressed below – but the general holding supports Plaintiffs' reading of the reservations in this case, not the government's.

### 2. *U.S. Power.*

The government's motion and supplemental memorandum rely heavily on *U.S. Power*, an unpublished memorandum decision of the Arizona Court of Appeals. Docs. 127 at 13-15; 142. The property at issue in that case was conveyed under a deed that contained a Mineral Reservation and a Railroad Reservation that are virtually identical to the reservations in this case. *U.S. Power Systems*, 1 CA-CV 98-0415, at *7-*8; *see* Doc. 128-7.[7] U.S. Power, as a successor in interest to Santa Fe, owned the mineral estate, and Red Mountain owned the surface estate. Both parties relied on *Spurlock*. Red Mountain argued that the mention of gravel in the Railroad Reservation made "clear that the parties to the deed did not intend to treat gravel as a mineral." *Id.* at *10. U.S. Power argued that gravel fit within the general meaning of "mineral" as defined in *Spurlock*, and that the other provision mentioning gravel was simply a "right of way easement in which the word 'gravel' [wa]s mentioned." *Id.* The trial court granted summary judgment for U.S. Power, and the Arizona Court of Appeals reversed.

The Court of Appeals reiterated *Spurlock*'s rule that the mineral estate owner owns "all commercially valuable substances separate from the soil," but stated that *Spurlock*'s general rule did "not supersede the universal rule that the court must give effect to the clear intent of the parties." *Id.* at *9, *11. The court then stated:

> The gravel reservation clause is more than an easement. It specifically allows the grantor to take gravel for railroad purposes. If the parties to the deed had intended to include gravel as a reserved mineral, there would have been no

---

[7] The Court could not locate the case in Westlaw and will cite to the page numbers at the bottom of the decision as it appears in the record as the government's exhibit. *See* Doc. 128-7 at 31-37.

need to give the grantor a specific right to use gravel under a separate clause because the grantor would have been able to take all the gravel it wanted under the mineral reservation clause.

*Id.* at *11. The court concluded that its "interpretation conclusively expressed the parties' intention with respect to sand and gravel and [was] consistent with [the] holding regarding a similar clause in *Spurlock*." *Id.*

This outcome supports the government's position, but it is contained in an unpublished memorandum decision. Under Arizona law, such a decision is not precedent and may be cited only to establish claim preclusion, issue preclusion, or law of the case, to assist a court in deciding whether to publish an opinion, grant a motion for reconsideration, or grant a petition for review, or for persuasive value if it was issued on or after January 1, 2015. *See* Ariz. Sup. Ct. R. 111(c)(1)(A)-(C). None of these conditions applies. As a result, *U.S. Power* cannot, under Arizona law, be cited as precedent or even for its persuasive value. *Id.*

Even if the Court were to consider *U.S. Power* for its persuasive value, the Court would not find it persuasive. First, as already explained, the *Spurlock* decision cited in *U.S. Power* did not decide the issue for which *U.S. Power* cites it. Second, it appears the parties in *U.S. Power* provided little analysis of the Railroad and Mineral Reservations. The Court of Appeals noted that "[t]he only mention U.S. Power makes of the gravel reservation clause is to describe the clause as a 'right of way easement in which the word "gravel" is mentioned,' and to acknowledge that it is not making a claim under that clause." Doc. 128-7 at 5. Third, *U.S. Power* refers to the Railroad Reservation as the "gravel reservation clause," even though it plainly limits the use of "gravel and ballast" to "railroad purposes." *Id*. This seems to reflect a misreading of this railroad-focused clause. Fourth, the Court does not agree with the Court of Appeals' reasoning that there would be no need to mention gravel in the Railroad Reservation if it were covered by the Mineral Reservation. The Railroad Reservation limits the extraction of gravel and ballast to railroad purposes. And, assuming it is the same as the railroad reservation in this case (a

fact which the government emphatically confirms (*see* Doc. 142 at 4)), it contains different payment provisions than the Mineral Reservation. Gravel and ballast may be taken for railroad purposes if the grantor or its successor pays *or offers to pay* for the land, whereas the Mineral Reservation requires actual payment. Doc. 126 at 2. This suggests that the right to proceed with removing gravel and ballast – which could be urgent if railroad construction was underway – is more liberally granted than for mineral extraction. Payment for the railroad purpose may also be made to "the legal representative, heirs, successors or assigns of the Grantee," whereas payments under the Mineral Reservation may be made only to the "successors and assigns" of the grantee. *Id.* at 2-3. This again suggests a more liberal right to proceed with railroad purposes. As a result, the Court cannot conclude that the mention of gravel and ballast in the Railroad Reservation necessarily excludes sand and gravel from the Mineral Reservation. The Mineral Reservation is unambiguous under *Spurlock* and includes commercially valuable sand and gravel, and the Railroad Reservation provides for a more expedited method of obtaining gravel and ballast when needed for railroad purposes.[8]

The Court also agrees with this observation by Plaintiffs:

The Railroad Reservation, on its face, is simply an "insurance policy" for Santa Fe such that, if it ever needed/wanted to build a new railroad line on the surface of the land that is the subject of the deed, it would have both the legal right to build and a detailed protocol for extracting and paying for the material needed for the railroad bed. Defendant provides no reason why, in the course of providing itself such an insurance policy, Santa Fe would also voluntarily limit the scope of the Mineral Reservation.

Doc. 143 at 9.

/ / /

_____

[8] As discussed below, the reference to "ballast" appears highly consistent with the railroad-focused intent of the Railroad Reservation. Defendant suggests that the parties should be afforded an opportunity to develop and disclose expert testimony on the meaning of ballast. Doc. 142 at 8 n.3. But this case has already been pending for far too long – more than seven years! The parties have had ample time to develop the evidence to be considered by the Court in construing the key terms in dispute.

### 3. *Carley.*

*Mendez v. Carley*, No. 1 CA-CV 03-0792 (Ariz. Ct. App. Oct. 19, 2004), is also an unpublished memorandum decision. Docs. 142 at 3; 139-3. Plaintiff Carley owned a parcel governed by a deed which contained Mineral and Railroad Reservations in favor of Santa Fe. *Id.* at 2.[9] The state filed a condemnation action against Carley's parcel and later named Santa Fe as a defendant. *Id.* at 3-4. Carley asked the Arizona Court of Appeals to overrule *Spurlock* and quiet title to the mineral estate in her favor, or narrow the scope of Santa Fe's mineral estate. *Id.* at 4. The trial court held that Santa Fe owned the mineral estate and Carley had no interest in the disputed minerals – decorative rock. *Id.* at 5. Santa Fe and the State stipulated to a judgment for Santa Fe's compensation for the condemned parcel's mineral estate, and Carley appealed. *Id.* at 6, 10.

Carley argued on appeal that the decorative rock was "ballast" within the meaning of the Railroad Reservation and not minerals within the Mineral Reservation, that Santa Fe had abandoned any rights under the Railroad Reservation, and that the decorative rock was therefore part of her surface estate. *Id.* at *16. She also argued that she held title to the decorative rock because Santa Fe – the mineral estate holder – did not seek the materials for "railroad purposes." *Id.* The Arizona Court of Appeals reaffirmed its holding in *Spurlock* and rejected Carley's arguments that the disputed decorative rock constituted "ballast" under its recognized meaning – "crushed rock used for a particular purpose." *Id.* at 10-17. Carley had also previously conceded certain facts which "demonstrate[ed] that the substances [were] not 'ballast' as defined [by] the U.S. Bureau of Mines." *Id.* at 17. "Based on *Spurlock*, a general mineral reservation . . . grant[ed] ownership of all such substances to the party holding the mineral reservation." *Id.* at 18. The court therefore rejected "Carley's contention that the fact that the substances [were] processed by crushing ma[de] them ballast under the railroad reservation because they otherwise [had] the characteristics outlined in *Spurlock* as substances covered by the mineral reservation." *Id.*

---

[9] The Court did not locate the decision in Westlaw and will cite to the page numbers at the bottom of the pages attached at Doc. 139-3 at 16.

This decision does not support the government's position. The government cites to *Carley*'s mention of the dictum in *Spurlock*. *See* Doc. 138 at 14. But *Carley* did not rely on that dictum for its holding, and its actual ruling – that decorative rock is covered by the Mineral Reservation under the broad meaning of minerals established in *Spurlock* – supports Plaintiff's position. All of this is rather academic, however, because *Carley* cannot be cited as precedent or for its persuasive value. *See* Ariz. Sup. Ct. R. 111(c)(1).

### 4. *Tucson Rock & Sand.*

In *Tucson Rock & Sand*, the issue was "[w]hether sand, rock and gravel [were] minerals, so as to be subject to a mineral lease" under an Arizona statute. 481 P.2d at 869. The Arizona Supreme Court held that the statute controlled the disposition of sand, rock, and gravel on state lands. *Id.* at 871. The court stated that because the "word 'mineral' [was] used in so many senses, dependent upon the context," ordinary dictionary definitions provided little help, and "the word [was] susceptible to limitation or expansion according to the intention with which it [was] used in the particular instrument or statute." *Id.* at 869 (citations omitted).

*Tucson Rock & Sand* supports a case-by-case approach to the parties' intent regarding the definition of minerals. And Arizona courts have instructed that the primary goal of deed interpretation is to give effect to the parties' intent. *See Campos*, 2014 WL 2159348 at *2 (citing cases); *Taylor*, 854 P.2d at 1139. The Arizona Supreme Court was required in *Tucson Rock & Sand* to interpret and harmonize a state statute and federal law, not the language of a deed with the type of provisions at issue here. The Supreme Court was not presented with the issue of whether a Railroad Reservation narrows a mineral estate owner's rights to sand and gravel – a right it would otherwise hold under a Mineral Reservation. *See Spurlock*, 694 P.2d at 306 (noting that two prior Arizona Court of Appeals decisions were factually distinguishable and not helpful, citing *Tucson Rock & Sand*). Moreover, the government concedes that, absent the Railroad Reservations, the Mineral Reservations would entitle Plaintiffs to the sand and gravel. Thus, whether sand and gravel constitute "minerals" under the Mineral Reservations does not answer whether the Railroad

Reservations reflect the parties' intent to include all sand and gravel in the surface estate – as the government now concedes. *See* Doc. 142 at 2-3.

### C. Analysis of the Getz and Wall Deed Language.

Because *Spurlock* broadly holds that the Mineral Reservation includes all commercially valuable subsurface materials – a fact the government concedes – the sole question is whether the Railroad Reservations demonstrate the original parties' intent to narrow the scope of rights granted in the Mineral Reservations. The government asserts that the Mineral Reservation does not include sand and gravel because the deeds "specifically provided for sand and gravel in the Railroad Reservations." Doc. 127 at 14.

The Court does not agree. The Railroad Reservations state that the Grantor,

> or The Atchison, Topeka and Santa Fe Railway Company, . . . or any railway company at least a majority of whose stock it owns, may at any time hereafter desire to construct across [the Schritter and NIC Parcels], any railroad tracks, telegraph and telephone lines, or other electric wire lines, oil or water pipe lines, roadways, ditches, flumes or aqueducts, or to operate on said premises *gravel and ballast pits and quarries and take material therefrom for railroad purposes*, . . . the land necessary and convenient *for the operation of such gravel and ballast pits and quarries and the taking of materials therefrom for railroad purposes*, may be appropriated by any such Company desiring to . . . operate such gravel and ballast pits and quarries, upon such Company paying a fixed price per acre for all the land above described, together with the fair value of all buildings and permanent improvements constructed upon the land so appropriated.

Doc. 126 at 2-3 (emphasis added).

The Court reads this language to mean that Santa Fe reserved its right to engage in various railroad operations on the conveyed land, such as placing railroad tracks, installing pipelines, digging ditches, or operating gravel and ballast pits and quarries "for railroad purposes." If Santa Fe chose to engage in these railroad activities, the Railroad Reservation provided that "the land necessary and convenient for" those activities "may be appropriated" by Santa Fe, provided Santa Fe paid a fixed price per acre for all land thus appropriated plus the fair value of any improvements on the land. In effect, the Railroad Reservation granted the railroad a right to interfere with the surface estate in the future, for

- 21 -

railroad purposes and for a price. Its intent was not to grant the railroad all rights to sand and gravel on the property. The reference to "gravel and ballast pits" was merely one in a list of possible "railroad purposes" to which the surface estate could be subjected.

This reading is supported by the fact that the Railroad Reservation refers to "gravel and ballast" rather than sand and gravel. Ballast, in the railroad context, is the crushed rock and gravel used to construct the bed of a railroad track. *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ballast ("gravel or broken stone laid in a railroad bed"). The Railroad Reservation clearly describes specific materials and activities necessary for the railroad operations Santa Fe was reserving the right to perform on the surface estate, unrelated to the "commercially valuable substances" already owned by the holder of the mineral estate through the Mineral Reservation. *See Spurlock*, 694 P.2d at 308.

The government concedes "that merely mentioning sand and gravel in a deed may not necessarily limit the general mineral reservation in a deed." Doc. 142 at 4. But the government relies heavily on *U.S. Power* and argues that because the reservation language there is identical to the reservations here, the Court should come to the same conclusion. *Id.* The Court does not agree for the reasons stated in the above discussion of *U.S. Power*.

The Court concludes that the phrase "gravel and ballast," when considered in context of the Railroad Reservation, showed Santa Fe's intent to reserve the right to appropriate the land for railroad purposes in the future, including the extraction of gravel and ballast needed to construct a rail line, rather than an intent to exclude sand and gravel from the general Mineral Reservation. The government asserts that differentiating between "gravel and ballast" and "sand and gravel" is "improper and irrelevant to the outcome," but the Court disagrees. Doc. 142 at 8. The phrases are different, and the differences cannot be ignored when seeking to determine the parties' intent. The Court "presume[s] that the parties intended to give the words employed their ordinary meaning and that the language used was placed in the contract for a specific purpose." *Tucker v. Byler*, 558 P.2d 732, 735 (Ariz. 1976); *Olguin v. Campbell*, No. 2 CA-CV 2014-0113, 2015 WL 4619858, at *3

(Ariz. Ct. App. Aug. 3, 2015) (same, citing *Tucker*).  The reference to "gravel and ballast" clearly relates to a railroad purpose, consistent with the overall intent of the Railroad Reservation, and distinguishes the phrase from the general reservation of minerals, including sand and gravel.

As already noted, the Court's obligation in this case is to apply Arizona law as faithfully as possible.  Because there is no decision by the Arizona Supreme Court on point, the government argues that the Court should follow the Arizona Court of Appeals' rulings in *Spurlock*, *U.S. Power*, and *Carley*.  As explained above, however, *U.S. Power* and *Carley* are not precedent and, under rules established by the Arizona Supreme Court, cannot even be cited for their persuasive value.  The question, then, is whether the Court should accept the dictum in *Spurlock* as indicating where the Arizona Supreme Court would come to rest on this issue.  The Court declines to do so.  The issue – whether the Railroad Reservation has the effect of removing sand and gravel from the Mineral Reservation – was never litigated by the parties in *Spurlock*, addressed by the trial court, or presented to the Court of Appeals.  The dictum, which consists of a single sentence, was therefore not made on the basis of briefing and a record, or even, it appears, on a careful reading of the language in the Railroad and Mineral Reservations.  The Court cannot conclude that *Spurlock*'s dictum provides any indication of how the Arizona Supreme Court would rule on this issue.  The Court instead reaches its decision by applying the other Arizona rules of deed construction.

In sum, the Court finds that the intent and meaning of the Railroad Reservation is plain, and is not reasonably susceptible to the government's reading.  *Campos*, 2014 WL 2159348, at *2; *Long*, 93 P.3d at 528.  Given *Spurlock*'s general rule, the government's concession that the Mineral Reservation applies absent the Railroad Reservation, and the plain deed language, the Court concludes that Plaintiffs, as owners of the mineral estates, hold title to the sand and gravel on the NIC and Schritter Parcels.  This interpretation avoids "render[ing] meaningless the language used by the parties," "utilize[es] all the language of the" the Mineral and Railroad Reservations, and "brings harmony . . . between all parts of

the [two provisions]." *Tucker v. Byler*, 558 P.2d 732, 735 (Ariz. 1976); *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993).

**IV.    Affirmative Defenses.**

The government argues that Plaintiffs are collaterally estopped by *Spurlock* from claiming title to the sand and gravel, and that the Schritters have waived their claims. Doc. 127 at 8.

**A.    Collateral Estoppel.**

Federal courts apply the collateral estoppel doctrine of the state where the judgment was rendered. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see also* Docs. 127 at 9; 134 at 19 (applying Arizona law). Under Arizona's collateral estoppel doctrine, a plaintiff must show that: (1) the issue was actually litigated in the previous proceeding, (2) the parties had a full and fair opportunity and motive to litigate the issue, (3) the state court entered a valid and final decision on the merits, (4) resolution of the issue was essential to the decision, and (5) there was common identity of the parties. *Hullett v. Cousin*, 63 P.3d 1029, 1034 (Ariz. 2003); *Garcia v. Gen. Motors Corp.*, 990 P.2d 1069, 1073 (Ariz. Ct. App. 1999). The government's collateral estoppel defense fails under the first prong. As noted above, the issue in this case was not litigated in *Spurlock* or decided by the trial court or the Arizona Court of Appeals.

**B.    Waiver.**

Waiver "requires a finding of intentional relinquishment of a known right or of conduct that would warrant such an inference." *Minjares v. State*, 219 P.3d 264, 268 (Ariz. Ct. App. 2009) (citing *Am. Cont'l Life Ins. v. Ranier Constr. Co.*, 607 P.2d 372, 374 (Ariz. 1980)). "A claim of waiver based on conduct . . . must include evidence of acts inconsistent with the intent to assert a right." *Id.* "A clear showing of intent to waive is required for waiver of rights." *Id.* (quoting *Goglia v. Bodnar*, 749 P.2d 921, 928 (Ariz. Ct. App. 1987)).

The government asserts that the Schritters have waived their claims to the sand and gravel because they conceded they lacked ownership rights to the sand and gravel in a proceeding before the IBLA, and their attorney conceded that BLM owned the sand and

gravel in an August 25, 2008 letter. Doc. 127 at 11. According to the government, these "communications demonstrate[d] the Schritters' express, intentional and voluntary relinquishment of any claim to sand and gravel under the deeds." *Id.*

The Schritters argue that in the "appeal from a 2005 trespass decision to the [IBLA], Mr. Schritter made a tactical decision not to contest the issue of sand and gravel in that particular proceeding" because a BLM representative told him he could not acquire title to the sand and gravel, only rights to the decorative rock, and he was more interested in decorative rock at the time given market conditions. *Id.* Plaintiffs also respond with the text of the Schritters' lawyer's letter, which stated:

> This is to confirm my telephone calls to you and Mr. Paul Misiaszek on August 5, 2008 in which I advised you and Mr. Misiaszek that Mr. Schritter has commenced removing and selling for landscape purposes the decorative stone he owns, separate from the sand and gravel owned by the BLM, in the land described in my letter dated February 13, 2008 to you.

Doc. 134 at 19. The Schritters assert that this letter does not show that they waived their rights to the sand and gravel in all future circumstances, and that they did not authorize their lawyer to make such a concession. *Id.*

The Administrative Law Judge's opinion in the IBLA proceeding notes that "Schritter concedes that sand and gravel are not part of the mineral estate, but claims that he may appropriate material from the surface in order to remove 'decorative rock,' which, he argues, is part of his mineral estate under controlling State law." *Alfred Jay Schritter*, 171 IBLA 123, 124 (2007). The opinion also notes that Mr. Schritter did not challenge the BLM's decision to the extent that it excluded "sand and gravel." *Id.* at 130. Thus, in a legal proceeding about the Schritters' rights in the land, they clearly waived any claim that sand and gravel were part of their mineral estate. This decision not to pursue any rights to sand and gravel is clear evidence of waiver. *See Minjares*, 219 P.3d at 268. The fact that a BLM representative may have cast doubt on the Schritters' likelihood of success as to the sand and gravel claim does not eliminate the waiver – rather, it is the sort of posturing that occurs commonly in adversarial proceedings. Moreover, the Schritters' assertion that

this was a tactical decision does not disprove their intent to waive. A tactical waiver of a right, especially in legal proceedings related to the right, is still a waiver.

The letter by the Schritters' lawyer over a year later, which again denied that the Schritters claimed the sand and gravel, reaffirms their intent to pursue certain rights and waive others. The Schritters assert that they did not authorize their lawyer to make this concession in either the IBLA proceeding or the letter. Doc. 134 at 19. But the Schritters authorized their lawyer to work on their behalf in the IBLA proceeding and to communicate with the BLM, and their lawyer's actions are therefore valid and binding on them. *See Am. Family Mut. Ins. Co. v. Zavala*, 302 F. Supp. 2d 1108, 1116-17 (D. Ariz. 2003). The Schritters cannot deny their lawyer's authority by asserting they did not consent to every action taken. Lawyers do not act with authority only when the client personally approves every step. *Id.* (collecting cases).

The Schritters' unequivocal concession in the IBLA proceeding, reaffirmed by their lawyer's letter a year later, supports a "clear showing of intent" by the Schritters to waive all future rights to sand and gravel, and is conduct "inconsistent with the intent to [later] assert a right." *Minjares*, 219 P.3d at 268; *Goglia*, 749 P.2d at 928.

**V.    Conclusion.**

The Court will grant summary judgment to Plaintiff NIC, quieting title to the sand and gravel on the NIC Parcel and in favor of NIC as the holder of the mineral estate. The Court will grant summary judgment to the United States on the sand and gravel in the Schritter Parcel because the Schritters waived their rights.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1   **IT IS ORDERED**: Plaintiffs' summary judgment motion (**Doc. 134**) is **granted in**
2   **part and denied in part**, and the government's summary judgment motion (**Doc. 127**) is
3   **granted in part and denied in part**.  Judgment will be entered in favor of Plaintiff NIC
4   as to NIC's rights to the sand and gravel on the NIC Parcel.  Judgement will be entered in
5   favor of the United States as to rights to the sand and gravel on the Schritter Parcel.  The
6   parties shall submit proposed forms of judgment within 15 days of this decision.
7       Dated this 10th day of June, 2019.

David G. Campbell
_____
David G. Campbell
Senior United States District Judge